910 So.2d 915 (2005)
Robert ENDACOTT, Appellant,
v.
INTERNATIONAL HOSPITALITY, INC., et al., Appellees.
No. 3D03-2718.
District Court of Appeal of Florida, Third District.
September 14, 2005.
*917 Lauri Waldman Ross; Tilghman & Vieth, P.A. and H. Mark Vieth, Miami, for appellant.
Kenny Nachwalter, P.A. and Richard H. Critchlow; Stephens, Lynn, Klein, LaCava, Hoffman & Puya, P.A. and Sherryll Martens Dunaj, Miami, for appellees.
Before LEVY, SHEPHERD, and CORTIÑAS, JJ.
CORTIÑAS, Judge.
The plaintiff, Robert Endacott ("Endacott"), appeals from a final order granting the defendants', Holland & Knight's ("H & K") and Allen, Norton & Blue's ("ANB"), motions for final summary judgment on Endacott's malicious prosecution claims, and a non-final order denying Endacott's motion for leave to amend his complaint to add a claim against H & K for punitive damages. We affirm.
In April 1995, Endacott created the Miami Casino Project ("Project"), which entailed building a five-star casino onboard a ship, namely a "Small Waterplane Area Twin Hull" vessel ("SWATH vessel"), based at the Port of Miami. Inverness Group, LLC ("Inverness") owned the concept for the Project. International Hospitality, Inc. ("IHI") was a Canadian corporation set up to own and operate the casino business. Inverness and IHI subsequently formed Cruiseco, a limited partnership, to own and operate the SWATH vessel. Endacott served as Inverness' managing member.
Inverness contracted with BSM Joint Venture ("BSM"), which agreed to build the SWATH vessel and provide on-site design, engineering, and construction supervision at a Brown & Root marine facility in Houston, Texas. Inverness also contracted with Gornitzki, Thompson & Little ("GTL"), a securities underwriter. Inverness and GTL agreed that GTL would act as an agent to provide financing and raise capital to build the SWATH vessel and operate the casino ("GTL Agreement"). IHI, Cruiseco, and GTL subsequently entered into another agreement, which provided, among other things, that Endacott would devote his "full time and attention" to IHI ("Amalco Operating Agreement"). Endacott signed both the GTL and the Amalco Operating Agreement.
Roy Gaul ("Gaul"), the on-site construction manager for BSM, estimated that the SWATH vessel would be built by August 1997 at a cost of $22 million, exclusive of other costs such as construction supervision. However, Gaul encountered construction problems, incurred cost overruns, and missed project deadlines.
In December 1996, Inverness, GTL, IHI, and Cruiseco entered into a "Second Operating Agreement," which named Endacott as IHI's Chairman of the Board, President, and CEO for a three-year term, and allowed him to receive two million restricted IHI shares, thereby making him IHI's largest individual shareholder. Thereafter, Endacott hired a Chief Financial Officer, Marc Feller ("Feller"), to resolve Gaul's budget and cost overruns, as *918 well as a special consultant, Chuck Merkel, to investigate the construction of the SWATH vessel.
Endacott initiated a forensic audit, which revealed that Gaul had significantly underestimated the cost of construction and independently changed the design of the SWATH vessel. Project expenditures were approximately $8-10 million over Gaul's initial estimates. Consequently, in February 1997, Endacott fired Gaul and withheld money due to certain contractors because of their alleged non-performance. However, Endacott wanted to continue working with the other BSM joint venturers, Aker Marine ("Aker") and Martran Consultants ("Martran").
Throughout this course of events, Inverness retained H & K as its counsel. In 1997, IHI also retained H & K. Endacott claims that H & K reviewed Gaul's contract, and drafted and reviewed IHI's officer employment contracts, including Endacott's employment contract. Endacott further claims that H & K advised Inverness to enter into an agreement with BSM, whereby 1) Aker and Martran would remain active on the Project, 2) Gaul would be replaced by John Waterhouse, on behalf of Elliott Bay, for day-to-day management of the Project, and 3) IHI would pay certain outstanding invoices ("Heads of Agreement"). As part of the "Heads of Agreement," Aker and Martran allegedly requested that they be released from any prospective consequential damages. H & K drafted those releases. However, the parties dispute whether IHI's Board of Directors authorized Endacott to instruct H & K to draft those releases and enter into a final version of the "Heads of Agreement," which included those releases.
On June 18, 1997, after Endacott allegedly secured a new $14 million ship financing commitment, IHI terminated him as CEO, but reappointed him Chairman of the Board at the same pay rate. Endacott claims that Amelia Maguire ("Maguire"), H & K's corporate attorney in charge of the IHI file, subsequently visited Endacott at his home, and was "angry and upset" because Endacott's termination as CEO jeopardized the Project. Endacott further claims that Maguire set up a meeting between Endacott and John Thompson ("Thompson"), a member of GTL, "to broker a `settlement' of IHI/Endacott claims" after his termination. At that meeting, Thompson allegedly threatened to "bury" Endacott in litigation and to "ruin" his reputation if he did not cooperate with IHI. Afterward, Maguire allegedly told Endacott that he should "seriously consider" cooperating with Thompson.[1]
After Endacott's termination, H & K and Goodman & Carr ("G & C"), a Canadian law firm, began analyzing IHI's potential claims against Endacott. On August 8, 1997, H & K's associate, Thomas Loffredo, prepared a memorandum ("H & K memorandum") stating that IHI calculated a $7,000,000 cost overrun on the Project caused by a delay in opening the casino SWATH vessel, and a $32,000,000 cost overrun "caused at least in part by Endacott's failure to devote his best efforts to IHI's interests in constructing the gaming vessel."
In response to H & K's memorandum, G & C's lawyer, Brian Donovan, prepared a memorandum on August 12, 1997 ("G & C's memorandum"), analyzing "causes of action which could be asserted against Endacott by IHI in Ontario." G & C's memorandum provided, in relevant part:

*919 (3) Unfortunately, the only apparently strong cause of action we can currently assert against Endacott is for the over-payment of US$25,000.00 in respect of his salary from IHI for January 1997.
(4) It may be possible to add claims for breach of fiduciary duty or negligent execution of corporate duties resulting in losses to IHI (i.e. cost overruns and delays); however, at present, we have no strong evidence that any of Endacott's activities caused these damages.
On August 18, 1997, G & C filed a "Statement of Claim" against Endacott in Ontario, Canada. The "Statement of Claim" included claims against Endacott, under Canadian law, for breach of statutory duties, misappropriation of $100,000 in company funds, interference in IHI's business affairs following Endacott's termination, $25,000 double payment in salary, and cost overruns on the Project.
However, before the "Statement of Claim" was served, Endacott sued IHI and others in Illinois, claiming that IHI breached its employment contract by terminating him and refusing to provide him severance pay. The Illinois action was eventually dismissed on forum non conveniens grounds.
Thereafter, Endacott initiated a lawsuit against IHI in Miami, Florida, for breach of his alleged employment contract and breach of a separate contract to pay him a fee for arranging financing for IHI ("underlying action"). On behalf of IHI, H & K filed a counterclaim alleging that Endacott breached his fiduciary duty by 1) signing employment contracts, including his own, without approval from IHI's board of directors and compensation committee, 2) failing to adequately supervise the Project, and 3) releasing and indemnifying Aker and Martran without approval from IHI's Board of Directors.
Endacott responded to IHI's counterclaim with third-party claims against H & K for indemnification and contribution. Consequently, ANB replaced H & K as IHI's counsel. H & K provided ANB lawyers with assistance and background information, and allowed them to review and copy documents related to the action.
Before trial began, IHI withdrew parts of its breach of fiduciary duty counterclaim against Endacott for unapproved employment contracts and unapproved releases, but retained the part relating to failure to adequately supervise the Project. In support of bringing its counterclaim, IHI claimed that Endacott was personally responsible for supervising every aspect of the Project. IHI further claimed that Endacott violated directives from IHI's Board of Directors concerning the construction of the SWATH vessel.
Endacott moved for a directed verdict on IHI's counterclaim for breach of fiduciary duty for failure to adequately supervise the Project, which the trial court ultimately granted. The trial court held that IHI failed to provide the requisite expert testimony regarding the standard for the legal and fiduciary duties of a corporate CEO. The trial court also held that IHI presented evidence that Endacott may have breached a fiduciary duty by violating at least one directive of IHI's Board of Directors regarding the construction of the SWATH vessel, but that IHI ultimately failed to prove specific damages caused by a breach of that fiduciary duty.
A jury trial was conducted, in which the jury returned a verdict in favor of Endacott, awarding him $600,000 in employee severance pay and $200,000 on his claim that IHI owed him a fee for arranging financing on the Project. After the jury award, IHI made a motion for judgment in accordance with its motion for directed verdict on the $600,000 award, claiming *920 that the employment agreement between IHI and Endacott was barred by the statute of frauds. The trial court granted IHI's motion, and this court affirmed that decision in Endacott v. International Hospitality, Inc., 796 So.2d 1177 (Fla. 3d DCA 2001).
Endacott subsequently brought a malicious prosecution action against H & K, ANB, IHI, two individual IHI members, and IHI's Chairman. Endacott did not assert a claim against G & C, but used the Canadian action as a basis for his malicious prosecution claim against H & K and ANB. Endacott sought leave to amend his complaint to add a claim for punitive damages against IHI, H & K, and the two individual IHI members, but the trial court deferred ruling on his motion.[2]
H & K and ANB moved for summary judgment on Endacott's claim for malicious prosecution. After conducting hearings on the motions for summary judgment, the trial court entered an order 1) granting H & K's and ANB's motions for summary judgment based on its finding that the defendants had probable cause to assert the counterclaim against Endacott, and 2) denying Endacott's earlier motion for leave to amend to add a claim for punitive damages with respect to H & K. Endacott appeals these rulings.
The first issue on appeal is whether the trial court properly found that the defendants had probable cause to pursue IHI's counterclaim against Endacott. We review the trial court's entry of summary judgment in favor of the defendants de novo. See Volusia County v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126 (Fla. 2000).
In order to prevail in a malicious prosecution action, the plaintiff must establish: (1) the commencement or continuance of an original judicial proceeding; (2) its legal causation by the present defendant against the present plaintiff who was the defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) a lack of probable cause for such proceeding; (5) the presence of malice; and (6) damages conforming to legal standards resulting to the present plaintiff. Alamo Rent-A-Car, Inc. v. Mancusi, 632 So.2d 1352 (Fla.1994); Burns v. GCC Beverages, Inc., 502 So.2d 1217 (Fla.1986); Scozari v. Barone, 546 So.2d 750 (Fla. 3d DCA 1989). If the plaintiff is unable to prove any one of these elements, the malicious prosecution action will fail. Alamo, 632 So.2d at 1355; Burns, 502 So.2d at 1218.
The two elements at issue here are whether the defendants lacked probable cause, and whether the defendants acted with malice in pursuing IHI's counterclaim against Endacott. In granting the defendants' motions for summary judgment, the trial court focused on the element of probable cause. The effect of the defendants' motions for summary judgment was to shift the burden to Endacott to prove that a material question of fact existed as to whether the defendants brought the suit without probable cause. See, e.g., Wright v. Yurko, 446 So.2d 1162 (Fla. 5th DCA 1984).
In a malicious prosecution action against attorneys, the plaintiff's standard for showing lack of probable cause appears to be higher than the standard in other malicious prosecution actions. In an action against an attorney, "[i]t is the attorney's reasonable and honest belief that his client has a tenable claim that is the attorney's probable cause for representation, and not the attorney's conviction that his client must prevail." C.A. Hansen Corp. v. *921 Wicker, Smith, Blomqvist, Tutan, O'Hara, McCoy, Graham & Lane, P.A., 613 So.2d 1336, 1338 (Fla. 3d DCA 1993)(quoting Central Fla. Mach. Co., Inc. v. Williams, 424 So.2d 201, 203 (Fla. 2d DCA 1983)). An attorney has the duty to represent the client zealously, not to insure that the client will succeed. C.A. Hansen Corp., 613 So.2d at 1338. Furthermore, so long as the attorney investigates the facts and law, and prosecutes a claim which a reasonable lawyer would regard as tenable, the plaintiff "has no right to assert malicious prosecution against the attorney if the lawyer's efforts prove unsuccessful." Id.
Endacott contends that H & K lacked probable cause to assert the counterclaim against him, and that H & K was on notice that it lacked probable cause before it filed the counterclaim. In support of his position, Endacott relies on G & C's memorandum, reciting that H & K did not offer sufficient evidence that Endacott's activities caused cost overruns. Endacott contends that G & C's memorandum pointed out "the lack of causation between Endacott's conduct, cost overruns, and scheduling problems."
In response, H & K contends that G & C's memorandum made clear that "H & K's analysis was limited to Florida, not Canadian, law," and that "the factual background was to be provided by the Canadian law firm, not H & K." H & K further contends that G & C's memorandum merely recited that G & C needed more evidence before filing its Statement of Claim in Canada. G & C's memorandum clearly stated that, "at present," there was insufficient evidence to show that Endacott's activities caused cost overruns on the project, but that "[i]t may be possible to add claims for breach of fiduciary duty or negligent execution of corporate duties resulting in losses to IHI." Thus, G & C's memorandum was not determinative evidence that H & K lacked probable cause to later bring the underlying counterclaim against Endacott on behalf of IHI, especially after H & K had the opportunity to gather more evidence in support of IHI's counterclaim.
More importantly, G & C, not H & K, filed the "Statement of Claim" against Endacott. However, even assuming that H & K was partly responsible for filing the "Statement of Claim" in Canada, we agree with the trial court that probable cause existed to file the Canadian action as well. The "Statement of Claim" filed in Canada asserted several additional claims against Endacott, which were not included in H & K's memorandum.
For example, Paragraph 13(i) of the "Statement of Claim" included allegations that Endacott failed to "devote his full time, attention, and best efforts to the Project" because he was involved with unrelated "large scale ventures," and was involved in the financing matters of an "unrelated company." Although not included in the final version, in a draft of the Statement of Claim, the "unrelated company" was named as Aqua Chem Inc., whose acquisition partner was Rush Creek LLC. IHI contends that Endacott failed to adequately supervise the Project because he was working as a consultant for Rush Creek LLC, while he was CEO of IHI and, therefore, he could not have been devoting his "full time and attention" to the Project as required by the Amalco Operating Agreement. Endacott allegedly entered into an agreement with Rush Creek LLC on February 6, 1997, and collected more than $680,000 for his services. Furthermore, Paragraph 13(ii) of the Statement of Claim alleged that Endacott used IHI's offices, facilities, and funds in his activities with the "unrelated company." Finally, Paragraph 13(iv) alleged *922 that Endacott "unilaterally terminated the Brown & Root contract" without corporate authority, and that he provided false and misleading information to IHI's Board of Directors.
These allegations in the "Statement of Claim" were not addressed in either H & K's or G & C's memoranda. Therefore, it is clear that the content in H & K's and G & C's memoranda was not the sole basis for pursuing IHI's counterclaim against Endacott.
Furthermore, in instigating an action against the plaintiff, the defendants need only show that they had a reasonable belief that the claim was valid based on the facts and circumstances known to them. Wright, 446 So.2d at 1166. The defendants need not be certain of the outcome of the underlying proceeding to have probable cause for bringing the counterclaim. See Goldstein v. Sabella, 88 So.2d 910, 911 (Fla.1956); Applestein v. Preston, 335 So.2d 604, 607 (Fla. 3d DCA 1976). Instead, as attorneys, the defendants are entitled to rely on their client's representations of fact. See, e.g., Baron v. Fieldstone, 581 So.2d 649, 650 (Fla. 3d DCA 1991)(reversing an award of attorney's fees on the basis that "counsel acted in good faith based on representations from his client" in accordance with Section 57.105, Florida Statutes (1998)); Moiel v. Sandlin, 571 S.W.2d 567, 570 (Tex.Civ.App.1978)(stating that "[u]nless lack of probable cause for a claim is obvious from the facts disclosed by the client or otherwise brought to the attorney's attention, he may assume the facts so disclosed are substantially correct"). In the instant case, H & K relied on IHI's representations of fact and filed the counterclaim only after IHI authorized H & K to do so.
Endacott further contends that the facts relied on by H & K and ANB to show probable cause are disputed and, therefore, the jury must determine their existence before the court determines their legal effect. See Alamo, 632 So.2d at 1357; Glass v. Parrish, 51 So.2d 717 (Fla.1951)(holding that, in a malicious prosecution action, conflicts in facts should be resolved by the jury but probable cause should be determined by the court). Probable cause only becomes a question for the jury when material facts are disputed. City of Pensacola v. Owens, 369 So.2d 328, 329 (Fla.1979); C.A. Hansen Corp., 613 So.2d at 1339. When the facts relied upon to show probable cause are undisputed, "the existence or nonexistence of probable cause is a pure question of law to be determined by the court under the facts and circumstances of each case." C.A. Hansen Corp., 613 So.2d at 1339; see also City of Pensacola, 369 So.2d at 329-30.
However, in the instant case, it is undisputed that, in pursuing IHI's counterclaim against Endacott, H & K and ANB relied on the following undisputed facts in support of IHI's claim that Endacott drafted unapproved employment contracts: (1) IHI's January 10, 1997 meeting minutes, signed by Endacott, stating that IHI's Board of Directors authorized Endacott "to retain counsel to draft agreements to be presented to the Compensation Committee for review and consideration before presentation to the board for approval;" (2) IHI's June 19, 1997 meeting minutes stating that "[t]he Compensation Committee informed the board that ... [the management contracts] of Messrs. Endacott, Felteau and Sheppard had not been processed by the Compensation Committee;" and (3) on or about June 21, 1997, after Endacott was terminated, Endacott sent signed employment contracts for himself, Felteau, and Sheppard to H & K.
In support of IHI's claim that Endacott failed to adequately supervise the Project, *923 H & K and ANB relied on the following undisputed facts: (1) as part of the Amalco Operating Agreement, Endacott agreed to devote his "full time and attention" to IHI; (2) Endacott admitted in his affidavit that he was the managing director "responsible for overseeing all aspects of the [P]roject;" (3) Endacott was providing consulting services to an unrelated company, Rush Creek LLC, while he was CEO of IHI; (4) Endacott received approximately $680,000 for the services he provided to Rush Creek LLC; (5) the budget of constructing the SWATH vessel increased substantially while Endacott was CEO of IHI; and (6) IHI's Chief Financial Officer, Feller, had information regarding costs attributable to Endacott's failure to adequately supervise the construction of the SWATH vessel.
Finally, in support of its claim that Endacott released Aker and Martran without IHI's approval, H & K and ANB relied on the following undisputed facts: (1) IHI's March 10, 1997 meeting minutes, signed by Endacott, reflecting that IHI's Board of Directors authorized management to implement the Heads of Agreement after the Board of Directors had "[a] discussion of the Heads of Agreement" which "Mr. Endacott reported was based on advice from [H & K];" (2) IHI's March 10, 1997 meetings made no mention of releasing Aker and Martran; (3) H & K representatives did not attend the March 10, 1997 meeting; and (4) before filing IHI's counterclaim, several IHI board member informed H & K that IHI never authorized Endacott to release Aker and Martran.
We find that these undisputed facts provided the defendants with sufficient probable cause to initiate and pursue IHI's counterclaim. Based on these undisputed facts provided by IHI, H & K and ANB had a "reasonable and honest belief" that IHI had a "tenable claim" against Endacott. Therefore, Endacott has failed to prove that a genuine issue of material fact exists as to whether H & K and ANB lacked probable cause to institute the counterclaim in the underlying action.
Endacott also contends that ANB lacked probable cause to continue pursuing IHI's counterclaim against Endacott. Endacott relies on a letter drafted by ANB's attorney, Rodolfo Gomez, demonstrating concern that Endacott may have been "duped" by Gaul. Endacott infers that IHI dropped two parts of IHI's counterclaim against him after Gomez drafted the letter. However, there can be no claim for malicious prosecution where at least part of the counterclaim for breach of fiduciary duty was asserted with probable cause. See, e.g., May v. Fundament, 444 So.2d 1171 (Fla. 4th DCA 1984); Moity v. Bodin, 489 So.2d 474 (La.Ct.App. 1986); Joseph H. Held & Assocs., Inc. v. Wolff, 39 S.W.3d 59 (Mo.Ct.App.2001). Furthermore, to prevail on a claim for malicious continuation of prosecution, the plaintiff must show that probable cause was lacking at all stages of the underlying proceeding. Ware v. United States, 971 F.Supp. 1442, 1462 (M.D.Fla.1997)(malicious prosecution action where former criminal defendant who had been acquitted failed to show that probable cause was lacking at all stages of the underlying prosecution, from indictment to acquittal).
Therefore, ANB only needs to demonstrate that it had probable cause to pursue IHI's counterclaim for breach of fiduciary duty, whether it be on the basis of the unapproved employment contracts, unapproved releases, or failure to adequately supervise the Project. Just as H & K had probable cause to bring the counterclaim for breach of fiduciary duty, we find that, based on the undisputed facts provided by IHI, ANB had probable cause to continue pursuing the counterclaim for breach of *924 fiduciary duty for failure to adequately supervise the Project.
Endacott further contends that ANB demonstrated a lack of probable cause when, in the underlying action, it failed to provide expert testimony and conceded that it had no evidence of damages caused by Endacott. However, termination of an underlying civil proceeding in favor of the present plaintiff is not sufficient evidence that the defendants lacked probable cause. See Wright, 446 So.2d at 1166. Although ANB failed to provide an expert or evidence of "a specific dollar amount of damages" caused by Endacott, the trial court found that the defendants presented sufficient evidence to establish that they had probable cause to pursue their counterclaim against Endacott for breach of fiduciary duty. Specifically, in the underlying action, the trial court stated:
You have presented evidence that [Endacott] disobeyed the orders of his board of directors and moved the contract from Brown & Root to Atlantic Marine. And that would support a cause of action for breach of fiduciary duty or negligence without expert testimony. But what's the damage attributable. You haven't proved up any specific dollar amount of damages attributable to that action.
Based on undisputed facts, we find that Endacott has failed to prove that a genuine issue of material fact exists as to whether H & K and ANB lacked probable cause to pursue IHI's counterclaim against him. H & K and ANB had a "reasonable and honest belief" that IHI had a tenable claim against Endacott for breach of fiduciary duty and, therefore, had probable cause to pursue IHI's counterclaims. See, e.g., C.A. Hansen Corp., 613 So.2d at 1339. Endacott's failure to prove that the defendants lacked probable cause is fatal to his action. See Burns, 502 So.2d at 1218. Because resolution of the issue of probable cause is dispositive, we need not address the issue of malice. See C.A. Hansen Corp., 613 So.2d at 1339.
The second issue on appeal is whether the trial court properly denied Endacott's motion for leave to amend his complaint to add a claim against H & K for punitive damages. We review the trial court's refusal to permit Endacott to amend his pleadings for abuse of discretion. See Williams v. Palm Beach Cmty. Coll. Found., Inc., 862 So.2d 917 (Fla. 4th DCA 2003); G.B. Holdings, Inc. v. Steinhauser, 862 So.2d 97 (Fla. 4th DCA 2003). We find that the trial court properly denied Endacott's motion for leave to amend his complaint to add a claim against H & K for punitive damages.
In order to recover punitive damages, the plaintiff must provide the court with "a reasonable evidentiary basis for punitive damages." Globe Newspaper Co. v. King, 658 So.2d 518, 520 (Fla.1995); see § 768.72, Fla. Stat. (1999). The plaintiff is required to show "gross misconduct or willful and wanton disregard of a plaintiff's rights." Alamo, 632 So.2d at 1357; see also Louis v. Costco Wholesale Corp., 719 So.2d 1226, 1228 (Fla. 4th DCA 1998). Since Endacott failed to prove that H & K lacked probable cause to pursue IHI's counterclaim against Endacott, he cannot prove that H & K engaged in gross misconduct or acted in willful and wanton disregard of Endacott's rights.
Affirmed.
NOTES
[1] The parties dispute what Maguire was referring to when she told Endacott to consider cooperating with Thompson, and whether Maguire knew of the threats at that time.
[2] The trial court eventually granted Endacott's motion for default against IHI.